J-S90001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.D.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.W. A/K/A C.M.W., FATHER | |
| | No. 1596 EDA 2016 |

Appeal from the Order Entered April 26, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000314-2016
CP-51-DP-0002301-2014

| | |
|---|---|
| IN THE INTEREST OF: T.C.Q.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.W. A/K/A C.M.W., FATHER | |
| | No. 1598 EDA 2016 |

Appeal from the Order Entered April 26, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000315-2016
CP-51-DP-0002302-2014

BEFORE:  OTT, J., SOLANO, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 02, 2016**

S.W. A/K/A C.M.W. ("Father") appeals from the orders entered April

26, 2016, in the Court of Common Pleas of Philadelphia County, Family

Court Division,[1] that involuntarily terminated his parental rights to his daughter, T.D.C., born in February of 2013, and his son, T.C.Q.C., born in August of 2014 (collectively "Children").[2] We affirm.

The trial court summarized the testimony presented at the termination hearing, as follows:

> On April 26, 2016, this Court held a Goal Change/Termination Hearing and heard testimony on DHS's [Department of Human Services] Petition to Terminate both Mother and Father's Rights as to their two (2) Children, and Change the Permanency Goal to Adoption. Both Mother and Father appeared and were represented by their respective attorneys.
>
> The first witness for the Department of Human Services (DHS), Tyrone Jessie, CUA [Community Umbrella Agency] Case Manager, testified that CUA became involved in February 25, 2015. He testified that single case plan meetings were held and that the parents did not attend those meetings.
>
> Mr. Jessie testified the Children came into care in November 2014, because of neglect going on with the family. The Children were living with Mother, although Mother and Father were together but living in separate homes.
>
> He testified Father's objectives were to maintain a drug-free status, to submit to three (3) random drug screens prior to Court, to continue going to Nu-Stop and continue to show clean screens. For his mental health, Father's objective was to schedule a BHS assessment and follow through with all recommendations, and finally, to maintain regular contact with the Children.

---

[1] By order of June 17, 2016, this Court consolidated the above-captioned appeals *sua sponte*.

[2] Mother's parental rights to T.D.C. and T.C.Q.C. were also involuntarily terminated by the trial court. Mother has filed an appeal at 1630 EDA 2016.

Mr. Jessie stated Father was referred to the CEU [Clinical Evaluation Unit] for a screen and assessment. Father did not comply however has complied since November 2015. He is receiving drug screens, completed a psychiatric evaluation on 1/11/2016, and was placed on Seroquel, Depakote, Dioxin and Xanax. He was also referred to anger management on 3/17/2016, and also referred to parenting classes. Father did test positive for marijuana on a screen on 10/7/2014.

Mr. Jessie opined the Children are in a safe environment now, and does not believe irreparable harm would come to the Children if Father's parental rights are terminated. He reasoned that Father has only attempted compliance since November 2015, and prior to that had not attempted to resolve the issues effecting his neglect of the Children.

He stated the Children are currently placed with the foster mother, A.B., and have been there since November 2014. They are safe and their needs are being met. They are attached to the foster mother.

On cross-examination, Mr. Jessie stated that on 6/18/2015 the compliance level of Mother and Father for their objectives of the plan were minimal and at the next Court date of 9/15/2015, there was a rating of non-compliance for both parents. The only report received by the Agency from CEU was 10/7/2014 and confirms the parents have not gone to CEU since that date. Regarding BHS, Mr. Jessie testified the parents have not complied with that objective either.

Further on cross-examination, Mr. Jessie acknowledged that he was aware Father was incarcerated from May 2015 to September 2015, and knew Father could not comply with objectives during this period. He stated Father had signed releases for Nu-Stop and was getting drug screens there. He further testified he observed Father during a visit with the Children and opined that Father arrived on time and acted appropriately with the Children.

On re-direct examination, Mr. Jessie stated Father did not comply with the BHS goals of attending biweekly visits after November 2015, did not comply with attending CEU after November 2015, did not comply with CUA's single case plan goals, and Father's only compliance was with Nu-Stop.

The next witness was Portia Bailey, Visitation Coach at Turning Points for Children, who testified she has been the visitation coach since March of 2015. She testified that based on Mother and Father's sporadic visits with the Children, visits were changed from weekly for two hours to one hour weekly, then when the parents continued to miss visits, they were changed to a one hour visit biweekly. Based on her notes, the parents attended overall half the scheduled visits. She observed that when the parents first missed their scheduled visits, the Children were sad and disappointed, however, as missed appointments became more frequent, the Children did not seem affected, and would be fine going back to their foster home. The Children call the foster mother "Mom", and case mother reacts to that by correcting them. She doesn't want the kids to call her Mom and tells them she is the Mother.

On cross-examination, Ms. Bailey testified the Children are bonded with the foster mother, and look to her to have their needs met. Foster mother takes the Children to their medical appointments, and is well-informed about T.D.C.'s asthmatic condition, administering treatments when necessary. She testified that out of 17 or 18 scheduled visits that she covered, the parents kept only 8 or 9 of them. Finally, she stated that during the visits Father and Children did interact well.

Father testified next, and stated he signed releases and attended Nu-Stop. He attended group and individual therapy sessions. He also attends anger management once a week at Nu-Stop on Thursdays. He further testified he goes to GPHA and his therapist is attempting to locate a parenting class for him. He admitted he missed visits with the Children, but stated he was working.

Trial Court Opinion, 7/27/2016, at 11–14 (record citations omitted).

On April 26, 2016, the trial court found by clear and convincing evidence that Father's parental rights should be terminated as to T.D.C. and T.C.Q.C., pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and

2511(b). Furthermore, the trial court changed the goal to adoption. This appeal by Father followed.

Father presents five issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 5.

Our standard of review is well established:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. **See** 23 Pa.C.S. § 2511. The burden rests upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with a consideration of section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the instant case, the trial court terminated Father's parental rights under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). We will focus on Sections 2511(a)(8) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: …
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
> >
> > …
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We first address whether the trial court erred by terminating Father's parental rights pursuant to Section 2511(a)(8).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).

"Notably, termination under Section 2511(a)(8)[] does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." **In re Adoption of R.J.S.**, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted) (emphasis in original).

Here, the trial court reasoned:

The Record demonstrates Father's ongoing inability to provide care or control for the Children or perform any parental duties and also his failure to remedy the conditions that brought the Children into care. Father was incarcerated during a period when the Children were in placement,[3] however, the evidence shows he failed to comply with the plan objectives once he was

_____

[3] Father was incarcerated from May, 2015, to September, 2015. **See** N.T., 4/26/2016, at 21.

- 7 -

released, as shown by the documents and testimony provided to this Court.

After hearing the credible testimony of the CUA Case Manager, and the Visitation Coach from Turning Points for Children, the Court found by clear and convincing evidence, that their observations and conclusions regarding Father's non-compliance with the FSP [Family Service Plan] objectives, and lack of ability and or refusal to fulfill his parental responsibilities were persuasive.

****

As discussed above, the Trial Court found that Father failed to comply with plan objectives and showed an incapacity to parent. He attended therapy at Nu-Stop after November 2015, after being released from incarceration and attended approximately half of the scheduled visitations. The Court was not persuaded that Father could or would resolve these issues in the near future.

This Court finds credible the testimony from the agency workers that the Children would not suffer irreparable harm if father's rights were terminated and that termination of Father's parental rights would be in the best interest of the Children.

Trial Court Opinion, 7/27/2016, at 16–17, 18.

With regard to the requirements of Section 2511(a)(8) that "[t]he child has been removed from the care of the parent," we agree with the trial court that "[C]hildren were effectively in the care of both parents when they were removed, the parents, at times, having lived together. Although they claim that they were living across the street from one another, its effective proximity supports the finding that the Children were in the care of both parents." N.T., 4/26/2016, at 63. Specifically, the record showed that at the time Children were removed, Father and Mother "were together, but not

- 8 -

living in the same home." *Id.* at 9. Mother testified that when their younger child, T.C.Q.C. was born, she and Father "lived right across the street," and Father was "there all the time." *Id.* at 55. Furthermore, the record shows that Children have been removed for a period of "12 months or more from the date of removal." 23 Pa.C.S. § 2511(a)(8).

In addition, "the conditions which led to the removal or placement of the child continue to exist," *id.*, because Father has been noncompliant with his reunification plan. Mr. Tyrone Jessie, CUA Case Manger Supervisor for Turning Points for Children, testified Father's objectives were:

> To maintain a drug-free status, [F]ather to submit three random drug screens prior to court, to continue going to Nu-Stop and continue to show clean screens.
>
> For his mental health, [F]ather will – will schedule a BHS assessment and follow through – all recommendations. Those were his – and as well maintain – along with mom – to maintain regular contact with the children.

N.T., 4/26/2016, at 10. In addition, he testified Father was referred to the CEU for a screen and assessment. *Id.* at 11.

Mr. Jessie specified that Father was compliant based on going to Nu-Stop, but he was not complying with all the court orders. *Id.* at 23. Mr. Jessie testified Father was not initially compliant, but since November, 2015, Father had attended Nu-Stop where he had drug screens, completed a psychiatric evaluation on January 11, 2016, was referred for anger management on March 17, 2016, and parenting classes, as well. *Id.* at 12. However, he stated Father did not go up to CEU after November 2015, and

did not go to BHS after November 2015. *Id.* at 23. In addition, he stated Father was not compliant with CUA's single case plan goals. *Id.*

Furthermore, Ms. Portia Bailey, Visitation Coach for CUA, testified that she had been in charge of the visitation for Father and Mother for the past year, that initially, they had visits on a weekly basis for two hours, but the visits became sporadic and were changed to one hour weekly, and then changed to bi-weekly because parents started to miss more and more visits. *Id.* at 24–25.

Finally, the record confirms that "termination of parental rights would best serve the needs and welfare of the child."[4]   23 Pa.C.S. § 2511(a)(8). This Court has stated that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting

_____

[4] With regard to Section 2511(a)(8) and 2511(b), it is important to note that

> Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. … Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such,  they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (citations omitted).

responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S., supra*, 901 A.2d at 513. Here, the record shows that T.D.C. – age three – has an asthma condition that requires careful attention, that T.C.Q.C. – age one and one-half – was removed from parents' care three months after birth, and that Children are bonded with their pre-adoptive foster parent and their needs are being met. *See* N.T., 4/26/2016, at 15–16, 17, 31–32, 38. At this point in their young lives Father's limited compliance with his objectives leaves Children in a prolonged state of limbo. Furthermore, Children's need for permanency must be weighed against concerns about Father's ability to meet Children's "needs and welfare" when the circumstances that led to Children's removal from parents' care was neglect evidenced by T.D.C.'s near-fatal asthma attack. *See Id.* at 8, 18–19.

Father contends DHS (petitioner) failed to prove by clear and convincing evidence that his parental rights should be terminated pursuant to Section 2511(a)(8), since he "has appropriate housing, was involved in Nu-Stop since November 2015 and visited the children to the best of his ability." Father's Brief at 17. This argument, however, is irrelevant. "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency

services." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations omitted). This Court has explained:

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. ... However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

***In re Adoption of R.J.S., supra***, 901 A.2d at 513 (emphasis in original) (citations omitted).

Here, at the conclusion of the termination hearing, the trial court stated on the record:

> Well, taking the evidence as a whole, and taking the exhibits that came in as part of the evidence in this petition to terminate, a few things stand out, and that is that the parents somehow try to blame the system because the system didn't reunite them with their children, when the parents had, and have, the obligation to do all they can to be reunited with their children.
>
> And instead of making efforts to reunite themselves with the Children, they make excuses because the system didn't do enough for them. And when asked about documentation to substantiate their claims, the documents are not presented.
>
> The reason they don't have records is because it was somebody else's job to get the records and present the records on behalf of them. And in the issues where there's a conflict between the

testimony, the Court finds the credibility to be with the witnesses for the Commonwealth, the Department of Human Services, and against the parents.

Therefore, taking the evidence into consideration, the Court finds, by clear and convincing evidence — this is with respect to both children — that the parents failed to remedy the issues that brought the children into Court, brought the children into DHS, and are not in a position to remedy, nor will they be in a position to remedy the issues that brought the children into care in the near future.

Considering that, under [Sections] 2511(a) (1), (2), (5) and (8), (8) because the children have been in care for one year, and (5) because the children were effectively in the care of both parents when they were removed, the parents, at times, having lived together.

Although they claim that they were living across the street from one another, its effective proximity supports the finding that the Children were in the care of both parents.

N.T., 4/26/2016, at 62–63.

Based upon our careful review of the record, the trial court's opinion, the briefs on appeal, and the relevant law, we conclude that the trial court's findings are supported by competent and sufficient evidence, and that it properly concluded grounds for involuntary termination of Father's parental rights exist pursuant to Section 2511(a)(8).

We next consider whether the trial court erred by terminating Father's parental rights under Section 2511(b). We have discussed our analysis pursuant to Section 2511(b) as follows:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding

- 13 -

analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M, supra*, 71 A.2d at 268 (citation omitted). The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of Childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

- 14 -

Here, the trial court opined on the record:

Also under [Section] 2511(b), it is in the best interest of the children that the parents' rights be terminated, and the goals be moved to adoption, and any harm that would be caused would be remedied.

There would be no irreparable harm, based upon the clear and convincing evidence on those issues. So, the parents' rights are terminated – both children – and the goal is moved to adoption for both children.

N.T., 4/26/2016, at 63–64. The only argument presented by Father to contest the trial court's Section 2511(b) determination is the bald assertion that "[t]he evidence presented by Petitioner did not rise to the level of clear and convincing evidence as required by the applicable case law." Father's Brief at 19. We disagree.

Mr. Jessie testified Children are currently in a safe environment. N.T., 4/26/2016, at 14. He testified he did not believe any irreparable harm would be done to Children if Father's rights were terminated. *Id.* Mr. Jessie explained Father had only been compliant since November 2015, and he noted "the length of the case and the basis that the case came in." *Id.* He stated Children have been with their foster mother, A.B., since November, 2014, and they were safe with their needs being met. *Id.* at 15. Mr. Jessie testified that T.D.C. has a loving relationship with A.B., and T.D.C. is attached to her. *Id.* He further stated T.C.Q.C. has a very good relationship with A.B., and is very attached to her. *Id.* at 16. Mr. Jessie testified he observed one visit where T.C.Q.C. was very weepy when he left A.B., but

was able to calm down for the rest of the visit with Father and Mother, and the visit went very well that day.[5] *Id.* He further testified that T.C.Q.C. has been with A.B. for most of his life. *Id.* at 17. He stated that DHS had become involved with this family in 2013 because there were neglect issues, that when T.C.Q.C. was born, he tested positive for marijuana and benzodiazepines and had to remain hospitalized, and services were put into the home in September of 2014. *Id.* at 18. He testified that, from his understanding, Father and Mother were living together at that time. *Id.* He stated on September 25, 2014, T.D.C. almost died from an asthma attack, and was "lifeless" when she was rushed to the hospital. *Id.* at 18–19. He testified DHS then obtained an order of protective custody on September 29, 2014. *Id.* at 19. He stated Father and Mother have not gone to CEU since October 7, 2014, and throughout the life of the case Father and Mother had not gone to BHS. *Id.* at 20.

Ms. Portia Bailey testified that she was the visitation coach for Father and Mother's visits since March, 2015, that the initial visits were on a weekly basis for two hours, but became sporadic and decreased to one hour weekly, and then biweekly, in June, 2015. *Id.* at 24–25. She explained the cause for the change was that Father and Mother attended half of the visits. She testified Children were happy to see Father and Mother and the snacks, toys

---

[5] Mr. Jessie did not indicate the date of the visit.

and clothes they brought Children; when Father and Mother did not visit, Children seemed to be sad. *Id.* at 25–26. She further stated, "as time went on, it didn't really seem to affect them" when Children came to the office and there wasn't a visit, and they were fine with just going back home with the foster parent. *Id.* at 26. She testified that the visits went from Children having a hard time transitioning and going back to the foster parent to Children looking forward to seeing the foster parent and happy to see the foster parent, A.B. *Id.* at 28. She stated Children call A.B. "mom." *Id.* She also stated she was aware Father was incarcerated from May 2015 to November 2015. *Id.* at 30.

She testified Children are bonded to the pre-adoptive foster parent, A.B., they look to her for their needs, they are ages three and one and one-half, and A.B. takes appropriate action for T.D.C.'s asthma. *Id.* at 31–32. She stated T.C.Q.C. cries when he leaves his pre-adoptive parent, and when he is picked up by her after a visit, he is excited. *Id.* Ms. Bailey testified that of the 17 or 18 visits she covered from March, 2015, Father and Mother only made eight or nine. *Id.* at 35. She testified Father interacted very well with Children during visits. *Id.* at 35–36.

Finally, Mr. Jessie testified that the children are more bonded with A.B. than with Father and Mother because they have been with her for the last 16 months, and the reason Children have been in care is Father and Mother's

failure to follow through with all court recommendations or court orders that have been set for them. *Id.* at 38.

The trial court found under Section 2511(b), it was "in the best interest of [Children] that the parents' rights be terminated, and the goals be moved to adoption, and any harm that would be caused would be remedied[, and t]here would be no irreparable harm, based upon the clear and convincing evidence on those issues." *Id.* at 63–64. While Father testified he "provide[s] for my kids and do the best I can, and … I've always got something for them … that's my world,"[6] competent, sufficient evidence of record supports the trial court's decision that termination of Father's parental rights best serves Children's developmental, physical, and emotional needs and welfare. *See* 23 Pa.C.S. § 2511(b), *supra*.

Accordingly, we affirm the trial court's determination that DHS proved grounds for the involuntary termination of Father's parental rights to T.D.C. and T.C.Q.C. pursuant to §§ 2511(a)(8) and (b).

Orders affirmed.

---

[6] N.T., 4/26/2016, at 58–59.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/2/2016</u>